

FILED
IN OPEN COURT

JAN - 8 2025

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:25-cr-\_\_\_ |
| | ) | |
| CHESAPEAKE REGIONAL MEDICAL | ) | 18 U.S.C. § 371 |
| CENTER, | ) | Conspiracy to Defraud the United States |
| | ) | and Interfere with Government Functions |
| | ) | (Count 1) |
| a/k/a CHESAPEAKE GENERAL | ) | |
| HOSPITAL, | ) | 18 U.S.C. §§ 1347 & 2 |
| | ) | Health Care Fraud |
| a/k/a CHESAPEAKE REGIONAL | ) | (Count 2) |
| HEALTHCARE, | ) | |
| | ) | Criminal Forfeiture |
| Defendant. | ) | |

## INDICTMENT

January 2025 Term – At Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

### Introductory Allegations

Health Care Benefit Programs

      1.     The term "health care benefit program" is defined in 18 U.S.C. § 24(b) to mean any public and private plan and contract, affecting commerce, under which any medical benefit, item, and service is provided to any individual, and includes any individual and entity who is providing a medical benefit, item, and service for which payment may be made under the plan and contract.

      2.     Medicare is a federal health insurance program administered by the Centers for Medicare and Medicaid Services (hereafter "CMS"), an agency of the U.S. Department of Health

1

and Human Services. Medicare helps pay for reasonable and medically necessary medical services for people aged 65 and older, and some persons under 65 who are blind or disabled.

3.      Medicaid is a state-administered health insurance program funded predominately by the federal government and administered by the Commonwealth of Virginia. Medicaid helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs. The Virginia Department of Medical Assistance Services (DMAS) administers the Medicaid program in Virginia.

4.      The TRICARE Program (TRICARE) is a health care benefit program of the United States Department of Defense Military Health System. TRICARE provides civilian health benefits for military personnel, military retirees, and their dependents.

5.      Anthem Blue Cross Blue Shield, Cigna, Aetna, Humana, Sentara Optima, and Optum are private health care insurance companies doing business in the Eastern District of Virginia.

6.      Medicare, Medicaid, TRICARE, Anthem Blue Cross Blue Shield, Cigna, Aetna, Humana, Sentara Optima, and Optum are "health care benefit programs."

7.      The American Medical Association publishes an annual manual of Current Procedural Terminology (CPT) codes. The CPT Manual is a listing of descriptive terms and identifying codes for reporting the nature and complexity of medical services and procedures performed by physicians. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services. In 2000, to implement the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Department of Health and Human Services designated the CPT Code set as a national coding standard for physicians and other health care professional services and procedures. As a result, for all financial and

2

administrative health care transactions, CPT Codes must be used in describing health care services rendered. Health care benefit programs contractually require health care providers, including hospitals and physicians, to use CPT Codes in submitting reimbursement claims.

8.     Health care providers are given and provided with online access to health care benefit program manuals and services bulletins describing proper billing procedures and billing rules and regulations.  Providers can only submit claims to health care benefit programs for medically necessary services they rendered, and providers are required to maintain patient records to verify that the services were provided as described on the claims.

9.     To receive payment, a provider must submit a claim using a UB-04 (hospital claim form) or CMS 1500 (physician claim form), a Health Insurance Claim Form (claim form).  Claims can be submitted electronically and by mail.

10.     The claim form requires information about: the date of service for the procedure, the service and supplies received, the name of the providing physician, the medical diagnosis, the place of service, and the service facility location, among other things.

11.     By submitting a claim, the provider certifies under penalty of perjury that the services and equipment were medically "indicated" and necessary.  In the act of submitting the claim, the provider is also certifying to the health care benefit program that everything contained in it is true and in compliance with rules and laws.  Health care benefit programs rely on the truth and accuracy of information on the claim form to determine whether to pay the provider for the equipment and services rendered.

12.     Health care benefit programs prohibited payment for items and services that were not "reasonable and necessary" for the diagnosis and treatment of an illness or injury.  Medicare claim forms, for example, require the provider who makes a claim for reimbursement to certify

that the services were "medically indicated and necessary for the health of the patient." The DMAS Manual for providers and practitioners states that the physician is responsible for certifying that the service is medically necessary any that the treatment prescribed is in accordance with the community standards of medical practice.

13.    Health care benefit programs also required providers to have and maintain sufficient documentation to support the medical necessity of performed procedures.

14.    Elective induction of labor in pregnant women – defined as inducing labor without medical necessity – before 39 weeks of gestation is associated with health risks for both the mother and baby. It is also contrary to the medical standard of care. Since 1979, the American College of Obstetricians and Gynecologists ("ACOG") has recommended against elective inductions before 39 weeks unless medically indicated. As a result, many healthcare benefit programs will not reimburse for such procedures as they are not aligned with established clinical guidelines.

15.    CMS maintains an "Inpatient Only" list, which includes specific procedures that must be performed in an inpatient setting due to their complexity, risk factors, or the need for extended postoperative care. These procedures require a minimum of 24 hours of postoperative recovery and monitoring to ensure patient safety. CMS updates the list annually. Procedures on this list typically involve significant surgical interventions, such as hysterectomies, that require close observation for potential complications. Medicare reimburses hospitals for these inpatient procedures only when performed in accordance with the guidelines. If such procedures are performed on an outpatient basis, Medicare will deny the claim. Likewise, many private insurance programs will not reimburse hospitals at the inpatient rate, often reimbursing at a significantly lower outpatient rate. The inpatient authorization process involves greater scrutiny as healthcare

providers must submit detailed clinical documentation for review to justify the medical necessity of performing the procedure in an inpatient setting.

Defendant

16.    Defendant Chesapeake Regional Medical Center ("CRMC") was a hospital in Chesapeake, Virginia, within the Eastern District of Virginia.   It was formerly known as Chesapeake General Hospital.  Its parent company is Chesapeake Regional Healthcare (CRH), which owns CRMC as well as several ancillary imaging and diagnostic centers, and a medical group.  CRMC was "rebranded" as CRH in 2015.

17.    CRMC contracted with health care benefit programs, including Medicare, Medicaid, TRICARE, Anthem Blue Cross Blue Shield, Cigna, Aetna, Humana, Sentara Optima, and Optum, and provided health care for beneficiaries of such programs, meaning it agreed to certain reimbursement rates for procedures it provided, and also agreed to abide by each program's rules, policies, and procedures.

18.    The vast majority of CRMC's revenues were from reimbursements from health care benefit programs for procedures performed at CRMC.  In order to perform a procedure at CRMC, a physician must either be a CRMC employee or have privileges at the hospital.  CRMC was aware that such physicians would also independently submit bills for reimbursements to health care benefit programs for the procedures they performed at CRMC.

Javaid Perwaiz

19.    Javaid Perwaiz was first licensed to practice medicine in Virginia in or around April 1980.  He was also board-certified to practice obstetrics and gynecology.  He was a solo practitioner and owned and operated Javaid A. Perwaiz, M.D., P.C., which had two offices in

Chesapeake, Virginia. Perwaiz applied to CRMC for privileges on or about September 1, 1983, and was granted privileges in April 1984.

20.    Perwaiz continued to conduct office visits, in-office diagnostic procedures, inpatient and outpatient surgical procedures, and obstetric deliveries throughout the Eastern District of Virginia until his arrest on November 8, 2019, including at CRMC. He was enrolled as a participating provider with numerous health care benefit programs, including Medicare, Medicaid, Anthem, Optima, and Humana. Perwaiz also routinely provided medical services for beneficiaries of other health care benefit programs, including TRICARE, Cigna, Aetna, United, and others.

21.    Perwaiz performed all of his obstetric deliveries and inpatient surgeries, including hysterectomies, and other surgeries and procedures, at CRMC. The vast majority of these procedures took place on Saturdays when he had a reserved surgical block time at CRMC. He often performed as many as ten surgeries per Saturday.

22.    In November 2020, Perwaiz was convicted of 52 counts of health care fraud and false statements in health care matters in 2:19-cr-189 in the U.S. District Court for the Eastern District of Virginia. Approximately 38 counts of the convictions were for procedures performed at CRMC, including unnecessary hysterectomies and other invasive and irreversible surgeries, elective inductions prior to 39 weeks of gestation without medical justification, and sterilizations of Medicaid patients without consent forms signed 30 days in advance.

CRMC's Credentialing of Perwaiz

23.    In order to perform a procedure at CRMC, a physician must either be a CRMC employee or have privileges at the hospital. Perwaiz applied to CRMC for privileges on or about September 1, 1983. While his application was pending, in December 1983, CRMC's President,

6

who remained the President/Chief Executive Officer (CEO) until 2005, was notified by Maryview Hospital in Portsmouth, Virginia, that Perwaiz's privileges at Maryview had been terminated earlier that year. Maryview terminated Perwaiz's privileges for performing unnecessary gynecological surgeries, including irreversible hysterectomies on approximately a dozen patients, including young patients of child-bearing age. After review of Perwaiz's application, CRMC's Department of Surgery initially declared him unacceptable for appointment, noting his suspension at Maryview for "unnecessary surgery." Nonetheless, in April 1984, CRMC granted Perwaiz privileges to perform surgeries there. Later that year, the Virginia Board of Medicine (which regulates physician licensing and is now called the Virginia Department of Health Professions (DHP)) addressed Perwaiz's conduct at Maryview by censuring him for lack of documentation and for having a sexual relationship with a patient.

24.     In 1995, Perwaiz was indicted on six counts of felony tax fraud in the U.S. District Court for the Eastern District of Virginia. He pleaded guilty to two of the counts, and admitted in public filings to extensive fraudulent conduct, including, among other things, falsely claiming a Ferrari luxury sports car as an ultrasound machine so that he could write it off as a business expense. CRMC's President wrote and submitted a letter of support for Perwaiz's 1996 sentencing, calling Perwaiz his "personal friend," and CRMC's Chief of the Department of OB/GYN attended the sentencing hearing. On April 10, 1996, the Court sentenced Perwaiz to four months of home confinement, probation, and community service.

25.     Following Perwaiz's felony conviction, on April 29, 1996, the Virginia Board of Medicine (the "Board") revoked Perwaiz's medical license. In June 1996, it held a hearing to determine whether Perwaiz's license should be reinstated, and ultimately reinstated it in July 1996 with stipulated terms and conditions. For the hearing, CRMC's President filed another letter of

support in June 1996 that contained, among other things, a "physician profitability" analysis. The President indicated that for calendar year 1995, CRMC was able to charge over $760,000 (or nearly $1.5 million in today's dollars) for Perwaiz's surgeries, resulting in a profit for the hospital of over $400 (or over $820 in today's dollars) "per case."

26.    A local OB/GYN with privileges at CRMC, W.R., also provided information regarding Perwaiz to the Board.  W.R. estimated that about 2/3 of Perwaiz's patients' surgeries were medically unnecessary.  He highlighted that Perwaiz had a high rate of surgery on young women with minimal problems, repeatedly operated on the same patients and conducted recurring surgeries on benign cysts, all of which "adds up to a very dangerous situation for patients."  W.R. noted that, as a consequence of the tax convictions, Perwaiz would have incentive to keep performing unnecessary surgeries as "he's going to go right back into practice and he's going to have to generate the income to pay those debts."  Regarding financial incentives, W.R. opined that "unnecessary gynecologic surgery is a growth industry in Chesapeake."  W.R. stated that four other doctors in his practice shared his concerns.

27.    The CRMC Executive Committee met shortly after the Board hearing and discussed W.R.'s testimony, of which it had ordered a transcript.  The meeting minutes reflect that it "view[ed] [W.R.'s] comments as a behavioral issue and will address it at the department level." In July 1996, the Executive Committee sent W.R. a letter demanding that he provide substantiating data and medical records.  W.R. ultimately declined on advice of an attorney and due to patient confidentiality.  After the Chesapeake Hospital Authority (the governing body over CRMC) recommended W.R. receive a letter of reprimand, the Executive Committee sent W.R. a letter on September 12, 1996 which, in part, read, "The Medical Staff Executive Committee has determined that [your statements] were reasonably likely to be harmful to the Hospital's best interests and

inconsistent with the Hospital's objectives and is recommending that you receive a letter of admonition and reprimand...You are hereby warned to refrain from making such unsupportable statements in any forum, and most importantly, in a public forum. If the Hospital Authority becomes aware of similar action on your part in the future, you may expect initiation of more severe corrective action."

28.    The Executive Committee then initiated a peer review of W.R.  On October 10, 1996, it sent him another letter demanding that he issue a letter of apology to CRMC's President. W.R. complied, stating, "This letter is to formally apologize for any comments that were made at the State Board of Medicine Hearing regarding Perwaiz's appeal for reinstatement of medical privileges that could have been interpreted as derogatory towards Chesapeake General Hospital. I am in the process of obtaining the charts and records you have requested to confirm any remarks that I did make.  Please contact me if you find this letter inadequate to comply with the hospital staffs Executive Board's request."  On November 22, 1996, CRMC formally reprimanded W.R. for failing to participate in the peer review process.

29.    W.R. expressed continuing concerns about Perwaiz in a letter to CRMC the following year:

December 4, 1997



Chesapeake Medical Executive Committee
    & Administration
Chesapeake General Hospital
736 S. Battlefield Blvd.
Chesapeake VA, 23320

Dear Sirs:

After reviewing a recent operating room schedule where Dr. Perwaiz had seven cases scheduled back to back in one day with one case involving a 22 year old who was having both ovaries removed and none of the patients older than 44 years, I believe Dr. Perwaiz has returned to the type of behavior that has had him to be dismissed from two hospital staffs, convicted of two felonies, an admission that his life-style was out of control, and that he had bribed health professionals to maintain his practice.

After I was brought before this body last year to explain my testimony to the Virginia Board of Medicine, I was asked to go through proper channels if I saw any medical care that was inappropriate. I believe this body needs to look into Dr. Perwaiz's surgical indications and review his activities. I have elected not to go through the Department of OB/GYN since this department had not taken any action prior to his previous convictions and because the individuals in power in the department almost unanimously supported his bid to return immediately to the staff after his last dismissal. Enclosed is an operative schedule from November.

30.     A registered nurse conducted a limited review of four of the seven cases W.R. referenced. The review for one of the surgeries did not address the absence of an abscess in pathology which Perwaiz alleged was the basis for the surgery, or that for another patient it was her 7th surgery by Perwaiz in six years. Other than this review, CRMC conducted no investigation or review of Perwaiz as a result of the Maryview suspension, the federal tax conviction, or W.R.'s concerns. In May 1998, it sent W.R. a letter telling him it was inappropriate to release an operating schedule to an outside party.

31.     CRMC periodically reviewed the credentials of practicing physicians, including Perwaiz, every two years. It continually re-credentialed Perwaiz approximately every two years between 1984 and 2019. Credentialing recommendations are ultimately approved by CRMC's CEO. Perwaiz was last re-credentialed in or around June 2019, and his re-credentialing packet contained information regarding his tax conviction and Maryview suspension.

32. Perwaiz's credentialing file also contained notes regarding medical malpractice lawsuits resulting from procedures he performed at CRMC. Public court records reflect that Perwaiz was a defendant in at least eight medical malpractice lawsuits between 1988 and 2019, including two where CRMC was named as a co-defendant. In 2009, a patient sued Perwaiz and CRMC after she sustained a puncture wound to her bladder during a hysterectomy. A CRMC employee's correspondence regarding the lawsuit noted that Perwaiz's documentation "consists of about 15 words" and that Perwaiz's deposition testimony conflicted with a CRMC nurse's contemporaneous notes. In 2014, patient D.A. sued Perwaiz and CRMC and alleged Perwaiz tricked her into having surgery by falsely telling her cancer was imminent, converted her surgery to an abdominal hysterectomy without her consent, and included false statements in her medical records.

33. From 2010 to 2019, CRMC received approximately $18.5 million in reimbursements from health care benefit programs for surgical and obstetric procedures Perwaiz performed at the facility.

CRMC's Knowing Facilitation of Violating Rules and Regulations of Health Care Benefit Programs

34. CMS mandated that certain procedures be performed "inpatient," due to the invasive nature of the surgery or other factors. To ensure patient safety, these procedures require a minimum of 24 hours of postoperative recovery and monitoring in the hospital before discharge. These procedures are listed on the Inpatient Only ("IPO") List. CMS routinely published a list of such procedures, which included hysterectomies. Certain health care benefit programs, including Medicare, would not reimburse a hospital for an inpatient procedure that is performed on an outpatient basis, and the majority of private health care benefit programs reimburse at a significantly lower rate. As both CRMC and Perwaiz knew, health care benefit programs apply

11

greater scrutiny for procedures performed inpatient, requiring an increased level of documentation supporting medical necessity for reimbursement.

35.    CRMC knew that Perwaiz routinely and knowingly misclassified IPO surgeries as outpatient[1] procedures but allowed him to continue performing these surgeries, knowing that he would bill health care benefit programs for reimbursement.  Although CRMC sometimes "wrote off" some of its own billings for those procedures, it also sometimes submitted its own bills to health care benefit programs for Perwaiz's surgeries that it knew should be classified as inpatient. CRMC employees repeatedly raised this issue to CRMC executives, but they allowed him to continue his practices.

36.    In late 2014, CRMC's Director of Finance alerted the Director of Care Management of a repeated problem of health care benefit programs refusing to pay CRMC's bills for procedures improperly billed as outpatient.  In June 2015, an Insurance Services/Pre-Registration Manager emailed a coding specialist and other employees stating, "Dr. Perwaiz likes to do his exploratory-lap[roscopie]s as OP [outpatient] . . . we often get his cases without much of anything on the posting forms, so we call the office and they provide codes (not always accurate) and status (not always accurate)."  He also wrote the Director of Care Management to note that Perwaiz "is our greatest challenge . . . .  He books his cases within 1-2 days generally and they are just difficult to get auth[orizations] from.  He does basically whatever he wants to do."

37.    In July 2015, CRMC's Director of Health Information Management emailed the Director of Care Management and the Director of Patient Access to request a meeting: "Could we please sit down and talk about the inpatient only procedures?  These are out of control."  The

---

[1] If a procedure is classified as outpatient, the patient will typically be discharged the same day as their surgery.

Director of Care Management initiated an analysis of one year's worth of data, which identified Perwaiz and another physician as repeatedly improperly classifying inpatient procedures as outpatient. While the other physician was receptive to counseling regarding the issue, Perwaiz was not, and instead became angry and refused to change his practices.

38.    CRMC requested elective cases be booked at least two weeks prior to the requested surgery date. At a minimum, the hospital required at least 48 hours' notice for non-emergent surgical cases to obtain the necessary authorizations and approvals from health care benefit programs, but CRMC routinely allowed Perwaiz to deviate from this policy. Perwaiz often scheduled his Saturday surgeries on late Friday afternoons. Perwaiz's surgical scheduler stated that Perwaiz wanted patients to undergo surgeries, including sterilization procedures, quickly so the patients would not have time to change their mind. Perwaiz said of scheduling, "If you do it too long out, they don't show up." As testified to at trial, Perwaiz's victims of unnecessary surgeries were often rushed into surgery after Perwaiz falsely told them they had cancer and needed immediate surgery.

39.    An Insurance Services/Pre-Registration Manager wrote in a July 2015 email that this put his team "at a major disadvantage" in performing authorization management functions. In August 2015, the Scheduling Manager wrote in an email to the Director of Care Management, the Chief Financial Officer (CFO) and other CRMC directors that "[t]his is an ongoing issue with Perwaiz" and that Perwaiz "continues to do whatever he wants."

40.    On August 19, 2015, CRMC's Director of Patient Access wrote in an email to another employee: "Currently, we are having specific physicians refuse to schedule as IP [inpatient] when it is an IP [inpatient] only. My guidance/opinion on this would be to not schedule the cases…. But we need executive support….Huge compliance issue." On August 28, 2015, an

Insurance Services/Pre-Registration Manager emailed the Director of Care Management, the Director of Patient Access, and the Scheduling Manager:

> I'm requesting a quick conference call to talk about Dr. Perwaiz. He contacted one of my staff members and told her not to contact his office and patients again and was extremely rude and claiming that we were rude. He hung up before he could be transferred to me. We have gone through this over the years, including myself, but we . . . need support from the C-Suite and the Directors to make sure that he adheres to the same protocols that other surgeons do. I have had enough of enabling his office. Every week we are scrambling to work his cases at the last minute.

The Director of Patient Access noted in an August 31, 2015 email that "[c]ulturally, this is something that needs to change with our organization."

41.    In October 2015, CRMC's Chief Medical Officer (CMO) held a meeting with Perwaiz, the Director of Care Management, and the Assistant to the Director of Care Management about the issue, and told Perwaiz that his practices were hurting the hospital and its patients. After the meeting, Perwaiz openly refused to comply, telling CRMC's schedulers that he had "been working these cases like this for over 30 years." The Scheduling Manager repeatedly warned the CMO that Perwaiz was pushing back on schedulers who attempted to refuse to post his inpatient surgeries as outpatient.

42.    CRMC schedulers, pre-admission staff, and nurses repeatedly emailed the Director of Care Management that the issue with Perwaiz continued. The Director of Care Management directed schedulers to continue booking his surgeries. On April 12, 2016, she wrote in an email to the Director of Health Information Management that Perwaiz "continues to do IP [inpatient] as OP [outpatient] admin is going to have to take a stand on this."

43.    In November 2016, there was a meeting between CRMC's interim CEO, Perwaiz, and the Director of Care Management. At the meeting, Perwaiz, who had recently been identified by CRMC's internal metrics as a "top ten" performer surpassing some multi-physician groups as

14

a solo practitioner—threatened to take his business elsewhere if CRMC did not allow him to continue performing inpatient surgeries as outpatient. On November 7, 2016, the CMO sent a letter to all surgeons which, in part, read "Beginning December 5th all procedures that are on the IP only list from CMS will require an IP order and authorization. These hospital procedures will require authorization regardless of payor if payor dictates the need for an IP authorization." Perwaiz continued using the improper outpatient classification. An Insurance Manager wrote in a January 13, 2017 email to the CMO, the Director of Care Management, the Director of Finance, the Director of Patient Access, and the Scheduling Manager that Perwaiz "could and should have submitted a request for an INPT Authorization." He also noted the increased scrutiny of the surgery that would have followed: "Possibly, VA Premier [the health care benefit program] would have sent the request for an inpatient admission to their Medical Director to review. However, wouldn't it be better to know if the existing clinical documentation supports or doesn't support an authorization for an inpatient admission?"

44.    Two weeks later, the Insurance Manager wrote in an email to the Director of Care Management, the Director of Patient Access, and the Scheduling Manager, "What are our options? [Perwaiz] is in clear non-compliance with our policy and per the posting sheet below is falsely representing what they have requested from [the health care benefit program]." The Director of Care Management responded, adding the CMO, CFO, and the Director of Finance to the email: "The bottom line is that [Perwaiz] would not and [is] not allowed to schedule at any Sentara facility without proper auth and orders but this needs to be an executive level decision....Again, no other facility will let him do this...." In one instance, the Director of Care Management addressed Perwaiz about these issues while accompanied by the then-CEO. In response, Perwaiz spat on the Director of Care Management.

45.     Internal emails also reflect that CRMC's executives were aware of Perwaiz's non-compliance, but continued to allow him to perform inpatient surgeries as outpatient.  In May 2017, a Nurse Case Manager emailed the Director of Care Management about the issue, noting that it "happens repeatedly with [Perwaiz]."  The Director of Care Management responded, "I have tried. It is up to the new CEO to change."  In response to another email about Perwaiz's non-compliance, the Director of Care Management wrote that she had "kicked this one up to the VP [vice president] level."  In August 2017, the CMO wrote to the Director of Care Management in response to another report of non-compliance that he would get the President/CEO to "hopefully agree to not allow it to be posted."  In response to another internal complaint the following year, the Director of Care Management wrote that "until administration changes rules we are stuck."

46.     In June 2019, the CMO requested a financial analysis of the issue.  The requested analysis showed that private health care benefit programs continued to pay the hospital the outpatient rate for dozens of inpatient surgeries.  On November 8, 2019, the Scheduling Manager advised the Director of Care Management and others that Perwaiz improperly scheduled an inpatient only procedure as outpatient for a Humana Gold Plus (Medicare Advantage Health Maintenance Organization) beneficiary.  Perwaiz's office staff told schedulers Perwaiz did not want to post the surgery as inpatient. Perwaiz continued to post, perform, and bill for non-compliant surgeries until his arrest on November 8, 2019.

47.     When a health care benefit program denied reimbursement in full or in part for an IPO procedure based on it being performed on an outpatient basis, CRMC's practice was typically to seek payment from the beneficiary, i.e., the patient.  CRMC continued to seek such payments from patients directly following Perwaiz's arrest, sending certain patient accounts to debt collection.

48.     Two nurses assigned to review medical records as part of the utilization review process[2] at CRMC on the weekends, when Perwaiz performed his surgeries at CRMC, frequently observed that Perwaiz's medical records lacked sufficient documentation. One estimated that approximately 90% of his charts failed utilization review and lacked documentation and independent lab results to support the medical necessity of his surgeries. They reported their concerns to management.

49.     CRMC coders and billers noticed repeated insufficient documentation in Perwaiz's patient records. One biller commented in an email in 2013 that "[t]his is really poor documentation. [T]he body of the op[eration] [report] doesn't even describe the [lysis of adhesions]. . . . I bet the MD office billed for all the procedures he documented [ ]."

50.     Unlike nearly all other surgeons at CRMC, Perwaiz did not use photography or videography in the operating room that would allow others in the operating room to see what procedures he was performing. One surgical technologist refused to continue working with him because she could not see what he was doing and informed the CRMC operating room manager of the same. In an August 2014 email, the Chief Medical Information Officer wrote regarding Perwaiz, "I do not believe that is standard . . . . to address post op orders prior to surgery. I know this would be a safety issue." A CRMC Appeals Coordinator wrote to the Director of Care Management, the Director of Health Information Management, a Health Information Manager, and others in March 2016 regarding one of Perwaiz's surgeries: "Sorry to keep bringing up these issues....The documentation that is currently showing in [the medical record] does not paint a clear

---

[2] Utilization review is a process in which a given patient's care plan—including their inpatient or outpatient status—undergoes evaluation, typically contemporaneous with their admission or procedure. The review determines the medical necessity of procedures and might make recommendations for alternative care or treatment.

picture of what happened to the patient during the stay. The [health & physical] is grossly lacking in any detail at all. I don't know how it can pass as an [health & physical] . . . . There's no way this can be billed with this kind of documentation."

51.    Independent, post-arrest analyses by health care benefit programs Anthem and Optima compared Perwaiz's surgery rates with that of his peers. The analyses formed the basis for calculations that estimated that from 2015 to 2019 approximately 80% of Perwaiz's surgeries were medically unnecessary.

52.    CRMC's Chief Medical Officer from 2017 through Perwaiz's arrest and conviction wrote in an email after Perwaiz's arrest that Perwaiz "wasn't high on our radar, but interesting that of all the medical staff he gave me the most grief about moving to centralized peer review and increasing scrutiny."

53.    In May 2017, CRMC staff became alarmed after discovering one of Perwaiz's pregnant patients was scheduled for surgical procedures which included sterilization. A CRMC nurse who spoke with the patient learned the patient knew she was pregnant but had not had a conversation with Perwaiz concerning the pending surgery. Perwaiz later advised the CRMC nurse that the patient had an ectopic pregnancy but he failed to provide updated records and documentation justifying the surgery prior to operating on the patient, despite the nurse's request. CRMC failed to conduct contemporaneous risk reporting or peer review for this incident.

54.    In January 2014, Perwaiz performed a gynecological surgery on patient M.M. at CRMC. Prior to her surgery, M.M. signed a CRMC consent form for an abdominal hysterectomy (a removal of the uterus and cervix through an incision in the abdomen). However, Perwaiz also performed a bilateral salpingo-oophorectomy (removal of the fallopian tubes and ovaries) even though the procedure was not on M.M.'s signed consent form. As documented in an email from

a surgical nurse (who testified at Perwaiz's trial) to the Director of Perioperative Services, Perwaiz added the procedure to the consent form after the patient was under anesthesia. The nurse who completed the consent form with M.M. before the surgery reported that M.M. did not want her ovaries and fallopian tubes removed. The surgical nurse wrote, "I feel as though we performed an assault on the patient if she truly did not want to have her ovaries removed. This just really bothers me."

55.    Six months later, in August 2014, Perwaiz removed tissue from patient T.D.C.'s left ovary. Prior to surgery, T.D.C. had signed a consent form for the removal of a mass from her right ovary. Perwaiz altered her consent form after the procedure. A nurse later wrote in an email to the Director of Perioperative Services that prior to the surgery, the operating room nurse had verified with both Perwaiz and the patient that the surgery was to be performed on her right side, which was reflected in the medical notes Perwaiz had dictated and the marking on the patient. Her email was forwarded to the CMO, who took no action despite his own "wrong site" surgeries in 2005 which resulted in a 4-month probation through 2010 and 2011. In a 2010 lecture at CRMC about his own "wrong site" incidents, he stated "I think I'm even a better chief medical officer because I'll be looking at physicians for issues . . . ."

56.    Three months later, in November 2014, patient P.A. reported to CRMC that Perwaiz had performed a hysterectomy on her at CRMC for a purportedly pre-cancerous lesion, but that she had learned in a post-surgery emergency room visit that the lesion was still present after the surgery. She reported Perwaiz had given her conflicting information about her condition. Her complaint was forwarded to the CMO and other employees; however, no action was taken.

57.    CRMC nurses observed that Perwaiz's patients often lacked an understanding of their surgeries and repeatedly noted pre- and post-operative knowledge deficits, including patients

who did not know what surgery they were going to have or had, and/or the reason for that surgery. For example, the CRMC medical record for patient S.N., on whom Perwaiz performed a hysterectomy at CRMC in December 2016 after falsely telling her she had cancer, noted that she had a knowledge deficit concerning her planned surgery. The concerns of a post-surgery nurse regarding Perwaiz's patients were escalated to the CMO in or around 2018.

58.     The CRMC medical record for patient D.C. noted that although Perwaiz had written the reason for D.C.'s 2013 surgery was pelvic and lower back pain, the patient denied prior to the surgery experiencing any pain when a CRMC nurse called her before the surgery. The medical record further reflects that D.C. told the nurse that she believed she was having surgery to address an enlarged right ovary. Instead, Perwaiz performed a hysterectomy on D.C. at CRMC and left her ovaries intact. He later crossed out the notation in D.C.'s record that she was experiencing pain and instead wrote she had "uterine prolapse."

59.     Title 42 of the Code of Federal Regulations (CFR) 441, Subpart F, requires valid consent forms for all sterilization procedures. Title 42 CFR § 441.258 and Medicaid Title XIX, in order to be reimbursed for such procedures by Medicaid, require a physician performing sterilization to certify that at least 30 days have passed between the date of the individual's signature on the consent form and the date of the sterilization procedure. This requirement was instituted, in part, to provide protection for vulnerable populations from coerced sterilization.

60.     Perwaiz repeatedly performed sterilizations on Medicaid patients at CRMC without valid consent forms, and CRMC knowingly allowed him to continue the same. On March 9, 2020, well after Perwaiz's arrest, CRMC advised the North Carolina Department of Health and Human Services of an internal audit it conducted concerning the placement of sterilization codes in the non-covered column when the patient's consent was not obtained at least 30 days in advance of a

sterilization procedure. CRMC provided the self-disclosure with a refund check in the amount of $22,921.53.

Medically Unnecessary Early Inductions

61.     An elective induction or delivery by Cesarean section without medical necessity of pregnant patients before 39 weeks of gestation is known to pose health risks for the mother and baby and is contrary to the medical standard of care. This has been the standard of care since the 1970s.

62.     Because Perwaiz saw his patients at his private offices Monday through Friday, conducted surgeries at another facility on Friday afternoons, and had his surgical block time at CRMC on Saturday mornings, the only time when he was routinely and conveniently available to perform obstetric deliveries was at CRMC on Saturdays. Because the chances of spontaneous labor on a day or time when Perwaiz was not available to perform the delivery increased as the pregnancy progressed, Perwaiz routinely scheduled his patients for elective inductions or Cesarean sections at CRMC on Saturdays for no medical reason prior to 39 weeks of gestation in order to ensure he was there to perform the delivery (and to bill insurance for it). An OB/GYN with privileges at CRMC reported after Perwaiz's arrest that he observed Perwaiz "seemingly had the luck of his obstetrical patients all reaching 39 weeks of gestation in batches that corresponded to when he was on a call and in the hospital."

63.     The need for intensive neonatal care for babies Perwaiz delivered early was so common that neonatologists practicing at CRMC referred to them as the "Perwaiz special." In or around 2008 or 2009, the neonatology group raised their concerns to CRMC management. In approximately the same timeframe, CRMC appointed Perwaiz as its chief of obstetrics, in which role he continued through at least 2010 and for which he received a periodic stipend from CRMC.

64.     In 2011, the Virginian-Pilot newspaper published an article entitled, "Chesapeake hospital's early births higher than most," reporting that Virginia's average for normal births between 37-39 weeks was 19%, while CRMC's was more than three times that, or 61%.

65.     CRMC knew that elective inductions before 39 weeks were unnecessary and contrary to the standard of care. In 2011, it enacted a written policy prohibiting elective inductions before 39 weeks of gestation and requiring physicians to submit an "updated prenatal record" at the time of scheduling a post-39-week induction.

66.     A June 2015 email from a Nurse Manager to the CMO noted that "[c]ertain MD's schedule procedures at 38.6 days (prior to 39 weeks) and state it is for maternal complications or fetal issues, fail to send supporting documentation. When closely looked at, they will fall out by 1 day because of convenience of the MD." She also noted false documentation by obstetricians, including obstetricians who "[p]erform[ed] cesarean sections on patients and calling it failure to progress when in fact the patient has not had an opportunity to labor effectively or at all," and "[p]erforming cesarean sections at close of day because of fetal heart rate issues that do not exist and documenting otherwise." Her concerns expressed in this email included both Perwaiz and other OB/GYNs at CRMC. Perwaiz and other physicians with privileges were nonetheless thereafter allowed to continue the practice of medically unnecessary early inductions.

67.     To schedule his elective inductions at CRMC, Perwaiz typically did not submit any ultrasounds, but instead a single sheet of paper known as an "OB flowsheet". For many of his obstetric patients, Perwaiz's OB flowsheet, also contained in the patient's medical record at CRMC, denoted two different due dates in two different styles of handwriting. While one due date (which Perwaiz had added) made it appear as if the induction was at or after 39 weeks, the second

one (written earlier by his staff at the patient's original appointment based on their ultrasound or last menstrual period) clearly indicated that the induction was before 39 weeks.

68.    Unlike almost every doctor, CRMC allowed Perwaiz to forgo the use of electronic medical records.  A May 2016 email among labor and delivery (L&D) employees identified Perwaiz was the only obstetrician who dictated his history & physicals and delivery notes.  The Nurse Manager emailed the Director of Women Services that "if an MD dictates their H&P the RN cannot view it to verify.  So other than the Drs word we cant truly document compliance."

69.    An analysis of records of TRICARE and Medicaid patients revealed that, in 2019, approximately 64% of Perwaiz's patient OB flowsheets contained two different dates, resulting in over 39% of Perwaiz's Medicaid and TRICARE deliveries at CRMC being performed prior to 39 weeks of gestation without medical indication.

70.    Perwaiz's medically unnecessary early inductions were an "open secret" in the L&D unit.  A CRMC L&D nurse noticed the issue after patients would report due dates different from the one Perwaiz had added, or deny symptoms Perwaiz had reported as a basis for early inductions.  She reported the issue to CRMC's L&D Nurse Manager, who directed her to continue to admit Perwaiz's patients for deliveries.  This L&D nurse also reported a similar issue with another patient to a L&D Nurse Supervisor.  The Nurse Supervisor directed the nurse to call Perwaiz to verify which of the two due dates were correct.  After the nurse expressed her concern that Perwaiz was changing due dates for his own convenience, the Nurse Supervisor reported the nurse to the L&D Nurse Manager, reprimanding her in a September 2018 email for saying "a negative thing about one of our best doctors" in front of other nurses.

71.    Jail messaging between Perwaiz and the L&D Nurse Supervisor while Perwaiz was awaiting trial indicated that the two had been in a close personal relationship.  The Nurse

Supervisor wrote to Perwaiz regarding wine, "I try to drink nothing less than 90 points but I can't justify drinking such expensive wine like you bought me. You spoiled me. I miss you. XOXOX" Perwaiz responded: "Hopefully one day soon I will have a chance to spoil you again. That gave me so much joy. Miss you far more. XO XO and much more." The Nurse Supervisor wrote back, "Just when I feel nothing positive will happen today . . . I get your so genuine and heart felt text. Now I feel much needed love and I can feel your warm embrace."

72.     During an Ad Hoc Committee Hearing in October 2021, the then CMO stated CRMC's OB Department was a real challenge because it was the most physician-centric place he had ever seen when he reported in September 2017. The CMO stated, "...that's one of the reasons they brought me here was try to get this ship righted and to make sure we're focused on patient safety and quality and not physician preference and making sure their lifestyle is as it is."

73.     After Perwaiz's November 2019 arrest for health care fraud stemming from gynecological surgeries, a coding specialist wrote to a L&D nurse in an email that she "always wondered about him. [T]errible documentation and he did so many preterm inductions."

74.     Perwaiz routinely gave his favored CRMC employees flowers, money, meals, and expensive gifts, a practice he continued for years. In 1996, during the proceedings concerning his medical license at the Virginia Department of Health, Perwaiz wrote that he "bought lavish gifts for friends, nurses, anesthesiologists and others who in any manner assisted with my practice." He particularly favored employees in L&D. From 2012 to 2019, his gifts also included a $200 gift card to a post-surgery nurse manager, a $200 check to a L&D nurse, a $500 check to his preferred surgical assistant, a $500 check to his preferred scrub technician, a $500 check to a perioperative nurse, and paying over $2000 to fund the retirement party of a L&D nurse.

## COUNT ONE
### (Conspiracy to Defraud the United States and Interfere with Government Functions)

75.     Paragraphs 1 through 73 of the Introductory Allegations are realleged as if repeated verbatim herein.

76.     Beginning at least as early as in and around January 2010 and continuing until in and around November 2019, in the Eastern District of Virginia, and elsewhere, the defendant, CHESAPEAKE REGIONAL MEDICAL CENTER ("CRMC"), a/k/a CHESAPEAKE GENERAL HOSPITAL, a/k/a CHESAPEAKE REGIONAL HEALTHCARE, Javaid Perwaiz, and others known and unknown, knowingly and willfully conspired and agreed together and with each other, to defraud by deceitful and dishonest means the United States and any agency thereof, including the CMS, Medicare, Medicaid, DMAS, and TRICARE, of and concerning its governmental functions and rights, including such functions and rights to receive accurate and truthful billing submissions, to have healthcare providers comply with applicable rules and regulations, and to ensure its beneficiaries receive medical care that is necessary and within the standard of care.

77.     It was a part of the conspiracy that CRMC and Perwaiz agreed to Perwaiz continually performing surgeries and other procedures at CRMC, for which surgeries and procedures both CRMC and Perwaiz would be reimbursed by Medicare, Medicaid, DMAS, TRICARE, and others, where such surgeries and procedures were performed in violation of the rules and regulations of such health care benefit programs, including, but not limited to, rules and regulations 1) requiring the existence and maintenance of sufficient documentation of medical necessity, 2) CMS rules requiring that certain particularly invasive procedures be performed only on an inpatient basis, 3) prohibiting the performance of sterilizations of Medicaid beneficiaries

without a consent form signed by the beneficiary at least 30 days in advance of the sterilization, and 4) requiring all medical treatment to be medically necessary and within the standard of care.

78.    The objects of the conspiracy were to obtain funds from health care benefit programs that would otherwise not be obtained and to prevent health care benefit programs from paying only for procedures performed in compliance with their rules and regulations.

79.    In furtherance of the conspiracy and to effect the purposes thereof, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

    a.    Continuously through on or about November 2, 2019, CRMC allowed Perwaiz to perform surgeries and other procedures on a weekly basis, which ended only because of Perwaiz's arrest, and continued thereafter to submit billing reimbursements for such procedures.

    b.    On or about October 29, 2019, Perwaiz performed a total abdominal hysterectomy and bilateral salpingo oophorectomy on patient D.B. based on false documentation of pelvic pain.  The hysterectomy was medically unnecessary.  D.B.'s secondary insurance was Humana Gold Plus, a Medicare HMO.  CRMC billed Humana for the procedures on or about December 17, 2019.

    c.    On or about October 12, 2019, Perwaiz performed a sterilization on Medicaid beneficiary V.B. at CRMC without a sterilization consent form signed by the patient more than 30 days in advance of a procedure, for which CRMC submitted a bill for reimbursement on or about October 30, 2019.

(All in violation of Title 18, United States Code, Section 371.)

## COUNT TWO
**(Health Care Fraud)**

80.     Paragraphs 1 through 73 of the Introductory Allegations are realleged as if repeated verbatim herein.

81.     Beginning at least as early as in and around January 2010 and continuing until in and around November 2019, in the Eastern District of Virginia, and elsewhere, the defendant CHESAPEAKE REGIONAL MEDICAL CENTER ("CRMC"), a/k/a CHESAPEAKE GENERAL HOSPITAL, a/k/a CHESAPEAKE REGIONAL HEALTHCARE, did knowingly and willfully execute, and attempt to execute, and aid and abet the same, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, Medicaid, TRICARE, Anthem, Optima, Humana, Cigna, Aetna, United, and others, and obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody of Medicare, Medicaid, TRICARE, Anthem, Optima, Humana, Cigna, Aetna, United, and others, in connection with the delivery of and payment for health care benefits, items, and services.

82.     The scheme and artifice to defraud was to obtain reimbursements from health care benefit programs for obstetric deliveries that were elective inductions for no medical reason before 39 weeks, contrary to medical necessity and the standard of care.  CRMC submitted such reimbursements itself, and aided and abetted Perwaiz and other physicians with privileges at CRMC doing the same, by knowingly allowing Perwaiz and other physicians to perform elective inductions before 39 weeks for no medical reason.

83.     Perwaiz exclusively performed his obstetric deliveries at CRMC and routinely scheduled them as elective inductions on Saturdays, a day when he was already scheduled be at CRMC to perform surgeries.  In order to schedule such deliveries, Perwaiz submitted to CRMC

an OB flowsheet which often had two different delivery dates clearly noted, which form was maintained in CRMC's patient records. One due date was accurate and within the standard of care, while the other one was fabricated later by Perwaiz in order to make it appear that the patient was actually at or after 39 weeks of gestation at the time of induction or cesarean section, when she was not. A review of such forms for Medicaid patients in 2019 revealed that approximately 64% of forms were altered, resulting in about 39% of his patients of CRMC being induced before 39 weeks of gestation for no medical reason.

84.    The scheme was also patently obvious based on Perwaiz's longstanding induction schedule at CRMC. An OB/GYN with privileges at CRMC observed in a tip to the FBI: "I noticed that Dr. Perwaiz seemingly had the luck of his obstetrical patients all reaching 39 weeks of gestation in batches that corresponded to when he was on a call and in the hospital. . . . I am concerned that Dr. Javaid Perwaiz was purposefully withholding patient's estimated due date so that he could falsify charts and make the patients 39 weeks when it was convenient for him to induce labor. This would inappropriately expose newborn babies to increase the risk of respiratory problems."

85.    CRMC employees and practitioners observed or were made aware of such discrepancies, but nonetheless allowed Perwaiz to continue such practices, and continued billing themselves for the same.

86.    For example, CRMC allowed Perwaiz to perform an elective induction for no medical reason of:

> a.  A.C., a Medicaid beneficiary, on or about September 21, 2019, when A.C. was only approximately 38 weeks and 2 days into gestation. CRMC billed

the claim on or about November 27, 2019, and it was finally adjudicated on
or about November 30, 2019.

b.  B.P., a Medicaid beneficiary, on or about October 19, 2019, when B.P. was
only approximately 38 weeks and 3 days into gestation.  CRMC's bill for
the procedure was finally adjudicated on November 29, 2019.

c.  H.M., a TRICARE beneficiary, on or about October 19, 2019, when H.M.
was only approximately 38 weeks and 5 days into gestation.  CRMC
submitted the bill for her claim over six months after Perwaiz's arrest, on or
about May 18, 2020, and it was finally adjudicated on or about August 21,
2020.

d.  A.B., a minor and Medicaid beneficiary, on or about October 26, 2019,
when A.B. was only approximately 37 weeks and 6 days into gestation.
A.B. had a previous delivery at CRMC in 2018, when she was only
approximately 38 weeks and 0 days into gestation.  CRMC's bill for the
procedure was finally adjudicated on or about December 17, 2019.

(All in violation of Title 18, United States Code, Sections 1347 and 2.)

## **FORFEITURE**

1.      The defendant, if convicted of the violation alleged in Count Two of this

Information, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule

of Criminal Procedure 32.2, any property, real or personal, that constitutes or is derived, directly

or indirectly, from gross proceeds traceable to the commission of the violation.

2.      If any property that is subject to forfeiture is not available, it is the intention of the

United States to seek an order forfeiting substitute assets pursuant to Title 21, United States

Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

3.      The property subject to forfeiture includes, but is not limited to, a monetary

judgment in the amount of the proceeds the defendant obtained as a result of Count Two.

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

*United States of America v. CHESAPEAKE REGIONAL MEDICAL CENTER*
2:25-cr-___

A TRUE BILL:

REDACTED COPY

FOREPERSON

JESSICA D. ABER
UNITED STATES ATTORNEY

By:_____
    E. Rebecca Gantt
    Assistant U.S. Attorneys
    United States Attorney's Office
    101 W. Main St., Suite 8000
    Norfolk, VA 23510
    Phone: (757) 441-6331
    Fax: (757) 441-6689
    Email: rebecca.gantt@usdoj.gov

By:_____
    Elizabeth M. Yusi
    Assistant U.S. Attorneys
    United States Attorney's Office
    101 W. Main St., Suite 8000
    Norfolk, VA 23510
    Phone: (757) 441-6331
    Fax: (757) 441-6689
    Email: elizabeth.yusi@usdoj.gov